## THE IDA S. DOW.

## THE HERMAN FRASCH.

District Court, E. D. Virginia.
Jan. 10, 1933.

Vandeventer, Eggleston & Black, of Norfolk, Va., for libelant.

Baird, White & Lanning, of Norfolk, Va., for libelee.

WAY, District Judge.

The collision between the steamer Herman Frasch and the schooner Ida S. Dow, out of which this controversy arises, occurred about 12:43 a. m., November 30, 1931, at a point about 90 miles southeast of Cape Henry.

The Ida S. Dow is a four-masted schooner of 1,411 gross, and 1,280 net, tons, and is 225 feet long, with a 43.2 foot beam, 19.8 foot depth of hold, with a loaded draft of 22 feet.

The Herman Frasch is a twin screw steamer of about 4,494 gross, and 2,641 net, tons, and is 356 feet long with a 52.6 foot beam.

At the time of the collision the steamer Frasch was light and on a voyage from New York to Galveston, Tex., while the Dow was carrying a cargo of 1,534 tons of coal on a voyage to Bermuda. The Frasch took her departure from New York on the morning of November 29, 1931, bound for Galveston. Off Barnegat Lightship, which she passed about 7 o'clock a. m., the Frasch's course was set at S. by W. ¾ W. magnetic for Diamond Shoals Lightship off Cape Hatteras. She continued on this course until about 12:42 a. m., November 30, 1931, when she had reached a point 220 miles or more, approximately south of Barnegat Lightship, having made an average speed of about 12½ knots an hour. The Frasch cut down her speed around midnight when she apparently first encountered dense fog. The Ida S. Dow passed Cape Henry about 1 o'clock p. m., on November 29th, on her voyage to Bermuda. She proceeded until about 12:43 a. m., November 30th, at which time she had reached a point about 90 miles southeast of Cape Henry, where her course intersected that of the Frasch, having made an average speed of approximately 8 knots an hour. The Dow was entirely dependent upon her sails for speed. On account of the fog and lighter breezes her speed was reduced in the latter part of her voyage.

For convenience the vessels will hereinafter be referred to as the schooner and the steamer.

The voyage of each vessel was apparently without any unusual incident until shortly before the collision. Each was proceeding through a dense fog which both had encountered some time before, when the watch on the schooner heard a blast of the steamer's whistle off the port quarter of the schooner. Immediately following this the schooner sent up a white flare which seems to have been observed almost instantly by the watch on the steamer. The engines of the steamer were

at once ordered full speed astern, by telegraph, and her helm put hard astarboard. Before either order could be carried out with effect, the collision occurred. The first contact between the vessels was the bow of the schooner striking against the starboard side of the steamer 25 to 30 feet abaft the latter's stem causing one small hole and several dents in the hull of the steamer, while the stem of the schooner was broken and splintered and her hull on the port side back of the stem crushed in by the momentum of the steamer. Up to the time of said blast from the steamer's whistle heard by the schooner immediately preceding the collision, neither vessel was aware of the other's presence in that vicinity.

In the libel by the schooner numerous faults are charged against the steamer, while in the cross-libel filed by the owner of the steamer practically the same charges, in substance, but with more brevity, are made against the schooner.

In the view that the court takes of the evidence the charges and counter charges come under four heads: (1) Lights; (2) lookouts; (3) fog signals; (4) speed of the two vessels involved.

After giving the evidence and the authorities relied on much careful thought, I have reached the following conclusions:

1. Lights:

The evidence does not show that any alleged failure of either vessel to carry the required lights contributed proximately to cause the collision. The density of the fog was such as to make lights of very little, if any, avail in avoiding a collision, particularly if a vessel were proceeding at any speed greater than necessary to maintain steerageway.

2. Lookouts:

It is found from the evidence that each vessel was maintaining as effective a lookout as was reasonably possible under the weather conditions then existing. As stated before, the fog was of such density as to make it practically impossible for the lookouts on either vessel to see a considerable distance in any direction. The correctness of this conclusion as to the sufficiency of the lookouts is indicated, I think, by the prompt action taken by the schooner after the latter first heard the whistle of the steamer. The schooner promptly sent up a white flare which the lookout on the steamer saw almost instantly. From these circumstances, and the testimony of the crews, I have concluded that the collision is not properly attributable in whole or in part to the alleged failure of either vessel to keep a proper lookout. As will appear herein below, the court has concluded that the collision was due solely to the steamer's proceeding through a dense fog at a speed which was clearly too great to enable those on watch to maintain any effective lookout.

3. Fog signals:

The positive testimony of the members of the crew of the steamer is that no siren or signal from the schooner was heard by them, and by the crew of the schooner that a blast of the steamer's whistle was not heard by them until the steamer must have been dangerously near the schooner. This testimony in each instance is of a distinctly negative character; that is to say, the witnesses for the steamer testify, in effect, that no fog signals were given by the schooner because they heard none, while the witnesses for the schooner, in effect, contend that the steamer's whistle was not blown with the required regularity, because the only blast heard was immediately preceding the collision. On the other hand, members of each crew have testified positively that proper signals were given by their vessel at the required intervals. The court is inclined to credit each crew on that issue, and concludes from such affirmative testimony that each vessel substantially complied with the applicable requirements by giving proper fog signals. In the light of the circumstances shown by all the testimony, the positive, affirmative testimony of one crew on that particular issue is not overcome by the negative testimony of the other crew to the effect that because they were not heard, fog signals were not given.

The pranks of sound passing through dense fog are too well known and appreciated to justify a conclusion by the court that because a whistle or siren did not happen to be heard by others nearby, it was not in fact sounded. In this connection, it seems patent to the court that if either vessel relied upon fog signals alone as was evidently necessary under the conditions shown to have existed, to warn other vessels in its vicinity, of its presence and movements, and depended alone upon other vessels to warn it by fog signals, of their presence, and nevertheless proceeded at a speed in excess of what was necessary to maintain steerageway, such vessel was guilty of serious fault.

4. The speed of the vessels shortly before the collision:

To this phase of the case the oral arguments and briefs of counsel have been principally directed. A careful study of the tes-

timony and the circumstances disclosed clearly convince me that this collision was caused solely by the excessive speed of at least one, if not both, of the vessels involved. It is apparent that except for excessive speed in the thick fog which then prevailed, the lookout maintained on each vessel in all probability would have become aware of the other vessel's presence in its vicinity in ample time to take effective steps to avoid a collision, if, indeed, except for such excessive speed, the vessels ever would have been in the immediate vicinity of each other on the voyages in question. At the time the steamer saw the white flare sent up by the schooner, it manifestly was too late for the vessels or either of them to take any effective steps to avoid the collision. The schooner being entirely dependent upon her sails for her movements was not in a position to do anything, while the period of time between seeing the flare sent up by the schooner and the collision was so brief that the steamer was not able to do anything more than endeavor to lessen the force of the impact which was then inevitable.

The decision of this case, therefore, turns upon the speed of the two vessels involved at the time they actually became aware of each other's presence, since, as already observed, the time transpiring between that moment and the moment of the collision was too brief for the crews of both vessels exerting their utmost to avoid the collision.

(a) What was the speed of the steamer immediately preceding her observing the flare?

The court is firmly of the opinion, as indicated to counsel during the oral argument, that the testimony and the uncontroverted circumstances show that the speed of the steamer was excessive at the times material to this inquiry, and was such as to make it clearly impossible for her to stop within the distance that her lookouts could see ahead in the nighttime and in the fog through which she was moving. That those in charge of the steamer, upon becoming aware of the schooner's presence, took immediate steps to try to avoid the collision or at least to lessen the force of the impact is apparent from the testimony. Notwithstanding the steps taken, the steamer struck the schooner a glancing blow with great force which damaged and crushed in the schooner's hull at her stem and on her port bow, and changed the course of the schooner. As indicated by the photographs (Libelant's Exhibits 1, 2, and 3), the schooner's damage resulted largely from the momentum of the steamer rather than from that of

the schooner. This conclusion as to the steamer's speed is further corroborated by the fact that the steamer with her engines full astern, and in spite of her impact with the schooner, continued on after the collision for some distance although meeting the breeze.

The testimony on behalf of the steamer is to the effect that her speed was reduced at midnight up to which time she had been making an average of about 12½ knots an hour from the time she passed Barnegat Lightship. The testimony of her second assistant engineer given before the inspectors, when considered in the light of the circumstances just referred to, and of the estimates of the crew of the schooner as to the speed of the steamer at the time of the collision, justifies the conclusion that such reduction in the steamer's speed at midnight was not sufficient to insure reasonable safety under the existing conditions. After such reduction as was made in her speed, she still proceeded at least 8 or 10 miles per hour, a speed decidedly greater than was necessary to maintain her steerageway, meeting the breeze as she was. In regard to her slowing down, reference is here made to the following testimony of her second assistant engineer given before the inspectors:

"Q. When you took charge of the watch at twelve o'clock, what speed were your engines making? A. I met the Captain on the outside on deck before I went down. The telegraph was at 'Stand by.' He told me I better shut down *a little,* and *I used my own judgment* and *give her about half.*

"Q. How many revolutions? A. *Around* forty-five.

"Q. How long have you been in that ship? A. This is my second trip.

"Q. The ship was light, not loaded? A. Yes, sir, the ship was light."

This testimony as to the steamer slackening her speed after she struck the thick fog about midnight is not such as to carry conviction in the light of the circumstances referred to, especially when to those circumstances, there is added estimates made by members of the crew of the schooner that the steamer was proceeding at a much greater rate of speed than she admits. The evidence in its entirety, as to the speed of the steamer, has therefore led me to conclude that she was proceeding at an excessive rate of speed immediately before the collision, which fault on her part contributed to cause, if it did not entirely cause, the collision in controversy.

(b) Speed of the Dow immediately before the collision:

An important factor to be considered in weighing the testimony on this issue is the velocity of the breeze which was from about southwest. The estimates given by the crews of the respective vessels as to the velocity of the breeze are highly conflicting. The steamer's crew estimate that the breeze was blowing 10 or 12, or as high as 14, miles an hour, while the schooner's crew estimate that the same breeze was blowing at a velocity of about 5 or 6 miles an hour. On the face of this testimony when considered alone, each set of witnesses would appear to be equally entitled to credibility, so that the court is forced to look to the circumstances of the case to ascertain whether they throw any light upon the weight to be given to the testimony of the witnesses. A careful consideration of the disclosed circumstances has led the court to conclude that they tend to corroborate the crew of the schooner as to the velocity of the breeze.

It is established that the schooner was proceeding on a southeasterly course through a breeze which was blowing from about southwest, so that it does not seem unreasonable to conclude that the members of the schooner's crew in observing the breeze felt nothing more than the force of the breeze itself. Furthermore, the schooner was wholly dependent upon the breeze for its speed and movements. For that reason it seems natural to conclude that in the ordinary course, the members of the schooner's crew observed the velocity of the breeze more keenly and accurately than did the crew of the steamer, which latter vessel was in no way dependent upon the breeze for its progress. Ordinarily, in the one case observation of the velocity of the breeze would be more or less casual, while, in the other, such observation would probably have immediate and vital connection with the business at hand, so that, other consideration being substantially equal, the observation made by the crew of the Dow should be the more accurate and dependable. As already observed, the schooner was heading across the breeze. On the other hand, the steamer was meeting it almost directly. To the impression which the breeze alone would make on the sense of feeling there was added the speed of the steamer, a combination which in all probability made a decidedly stronger impression of velocity on the steamer's crew than the breeze alone would have made. Therefore, we have a case of the conflicting interested testimony of two sets of witnesses, more or less evenly balanced, with the dis-

closed circumstances tending, it seems to me, to show that the testimony of the members of the schooner's crew should be accorded the greater weight.

From these and other circumstances in the case, the court has concluded that the estimates of the velocity of the breeze given by the schooner's crew are more accurate and dependable than those of the steamer's crew.

The testimony of respondent's witnesses, if entitled to full weight, tends strongly to show that the schooner was proceeding immediately prior to the collision at a speed greater than was reasonably necessary to maintain her steerageway and estimate that speed to have been at least 5 or 6 miles an hour, or, as testified by one witness for respondent: "She was going equally as fast as my ship was going." Capt. Westerling, p. 88.

The members of the crew of the schooner are equally positive in their testimony that the schooner was making from two to not over 3 or 3½ miles an hour. While the schooner carried twelve sails, at that time only seven of them were set. In this situation it seems desirable again to consider the uncontroverted circumstances disclosed by the testimony. As already observed, the photographs of the schooner (Libelant's Exhibits Dow 1, 2, and 3) seem to indicate that the damage to the schooner resulted very largely from the momentum of the steamer rather than from that of the schooner. The extent to which the timbers of the schooner are broken, splintered, and driven in at her stem and on her port bow, has already been mentioned. The dents in the steamer made by the bow of the schooner appear to be comparatively slight when the schooner's size and tonnage, and the tonnage of her cargo are considered, she being laden with 1,534 tons of coal, while the steamer was light. The comparatively slight aperture or hole and the dents in the hull of the steamer are not entirely explained away by the fact that the hull of the one was wood and that of the other steel and by the difference in the size and tonnage of the two vessels.

The opportunity of the steamer's crew to observe the schooner's speed and thereby form estimates was limited, to say the least, being confined to the brief period which elapsed between the moment the flare was observed and the moment of actual impact, very shortly thereafter. The testimony of two of respondent's witnesses indicates this lack of an adequate opportunity to observe the schooner's speed. Naylor (pages 20 and 21) testified that he could not make out how many sails

the schooner had set and could give no accurate estimate of her speed, only that he could tell she was "moving rapidly through the water because her sails were bellied out." Witness Jensen (pages 41 and 42) testified that he could only see a couple of masts with sails set and did not know whether there were three or four masts at the time; that he "couldn't make it out"; that "the interval in between these two incidents was so short that the schooner certainly must have moved" (the incidents referred to being the observation of the flare and the collision); and that he *"couldn't see plainly enough to estimate just how much the sails were pulling, whether they were bellying or not."* I refer to this testimony as illustrative of the fact that the opportunity of the witnesses on the steamer to observe the speed of the schooner was very brief and, due to the fact that it was nighttime and in a dense fog, unsatisfactory.

In conflict with the testimony of that character on behalf of the steamer, is that of libelant's witnesses Pomair, Feliz, Doejay, and F. L. Plummer, whose estimates of the speed of the schooner vary from 2 miles to not over 3 or 3½ miles an hour, with the circumstances already mentioned in discussing the velocity of the breeze, that the schooner's witnesses probably made their observations in the course of the performance of their duties and that they had decidedly longer periods in which to make such observations than the steamer's crew had. It, therefore, seems to the court that it would be arbitrary and unjustified to ignore these uncontroverted circumstances in determining the weight which should be given to the testimony of the crew of the steamer and that of the schooner, respectively, on this issue.

During the oral argument the court was considerably impressed by the average speed made by the schooner on her voyage to the scene of the collision as indicative of her speed at the time of the collision. More mature consideration of that phase of the case in the light of all the evidence has led me to conclude that it lacks the importance in the decision of the case which I was at first inclined to give it. The preponderance of the testimony on that phase of the case tends to show that decided reductions were made in the speed of the schooner after the earlier hours of her voyage. Certainly, the mere fact of an average speed of so much an hour fails to overcome the positive testimony of witnesses in a position to observe, and whose duty it was to observe, as to the speed of the vessel immediately before the collision. It would be just as logical to conclude that the steamer at the time she saw the flare was making a speed of twelve or thirteen miles an hour, because that was her average speed on the voyage, whereas she reduced her speed about midnight to the extent hereinabove noted.

The court, therefore, finds from the testimony and the uncontroverted circumstances that at the time of the collision in question the Ida S. Dow was proceeding at a speed of about 3 miles per hour, which was not greater than was necessary to maintain the steerageway of a sailing vessel of her size and cargo burden proceeding across the breeze then prevailing in her vicinity; that the Herman Frasch immediately before the collision and at the time the flare was observed by her was proceeding at a speed of at least 8 to 10 miles per hour; that such speed, under the circumstances of the case, was clearly excessive; and that the collision resulted solely from her excessive speed.

A decree adjudging the steamer Herman Frasch to be solely responsible for the collision and the damage resulting therefrom will be entered upon presentation.